UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

---------------------------------------------------------------- x
JACKSON TADDEO-WAITE,                               :
                                                    :
                              Plaintiff,            :
                                                    :     **MEMORANDUM &**
           -against-                                :     **ORDER**
                                                    :
X. CORP. and X. AI CORP.,                           :     3:25-CV-00874 (VDO)
                                                    :
                              Defendants.           :
---------------------------------------------------------------- x

**VERNON D. OLIVER**, United States District Judge:

The Plaintiff, Jackson Taddeo-Waite ("Taddeo-Waite"), brings this action in seven counts against the defendants, X. Corp. and X. AI Corp. (the "Defendants"), asserting that an allegedly defamatory post concerning his 10-year-old daughter appeared on X, a social media platform, on April 8, 2025, and that X subsequently refused Plaintiff's requests to remove the post. The Defendants have filed a motion to transfer the action to the Northern District of Texas in accordance with two contractual forum-selection clauses. For the reasons stated below, Defendants' motion is **GRANTED**.

## BACKGROUND

Plaintiff filed the Complaint in this matter on May 30, 2025.[1] Defendants filed the instant motion on August 4, 2025 (the "Motion").[2] Plaintiff filed his response on September 2, 2025 (the "Response").[3] Defendants then filed their reply on September 16, 2025 (the

---

[1] Compl., ECF No. 1.

[2] Mot., ECF No. 37.

[3] Resp., ECF No. 45.

"Reply").[4] The Court requested supplemental briefing from both parties.[5] Plaintiff filed his supplemental brief on October 10, 2025, ("Plaintiff's Supplement")[6] and Defendants filed theirs on October 17, 2025 ("Defendants' Supplement.").[7]

In the pending motion, Defendants seek a transfer of the instant case to the U.S. District Court for the Northern District of Texas pursuant to 28 U.S.C. § 1404(a) and in accordance with the forum-selection clauses contained in the terms of Defendant X Corp.'s Terms of Service and Purchaser Terms of Service (together, the "Relevant Terms").[8] Per the Defendants' request,[9] the Court takes judicial notice of the Relevant Terms.[10] Defendants contend that "Plaintiff agreed to the Relevant Terms" in two instances: first, "when he created and used his account," and second, when he created and used his "Premium+ subscription on X Corp.'s social media platform, X," the social media platform formerly known as Twitter.[11]

First, Defendants assert that "[i]n creating and using his account, Plaintiff necessarily agreed to X Corp.'s Terms of Service."[12] The Terms of Service contain a forum-selection

---

[4] Reply, ECF No. 46.

[5] Order, ECF No. 51.

[6] Pl. Suppl., ECF No. 52.

[7] Def. Suppl., ECF No. 53.

[8] Mot.at 1.

[9] Request for Judicial Notice ("RJN"), ECF No. 38 at 2.

[10] Courts routinely take judicial notice of webpages, because their contents are not subject to reasonable dispute, including a company's terms of service. *See, e.g., Force v. Facebook, Inc.*, 934 F.3d 53, 59–60 (2d Cir. 2019).

[11] *Id.*

[12] Mot. at 3 (citing RJN, Ex. 1, ECF No. 38-1 at 2 ("These Terms of Service ('Terms') govern your and other users' access to and use of the services….By using the Services you agree to be bound by these Terms.")).

clause that states: "All disputes related to these Terms or the Services, including without limitation disputes related to or arising from other users' and third parties' use of the Services and any Content made available by other users and third parties on the Services, will be brought solely in the U.S. District Court for the Northern District of Texas or state courts located in Tarrant County, Texas, United States, and you consent to personal jurisdiction and waive any objection as to inconvenient forum."[13] The Terms of Service define the term "Services" to include X Corp.'s "various websites," such as the X platform.[14] The Terms also contain a choice of law clause providing that "[t]he laws of the State of Texas, excluding its choice of law provisions, will govern these Terms and any dispute that arises between [Plaintiff] and [X Corp.]."[15]

Second, Defendants assert that "Plaintiff's use and creation of his X Premium+ subscription constituted his agreement to X's Purchaser Terms of Service."[16] The Purchaser Terms of Service, in turn, "also include a Texas choice-of-law clause and a forum-selection clause designating the Northern District of Texas as an appropriate venue."[17] Specifically, they state that "The laws of the State of Texas . . . will govern these Terms and any dispute that arises between you and us . . . .All disputes related to these Terms, including any disputes, claims, or controversies arising out of or relating to these Terms, will be brought exclusively

---

[13] RJN, Ex. 1 at 5.

[14] *Id.* at 2.

[15] *Id.* at 5.

[16] *Id.* at 1 ("To the extent that you sign up for and/or use a Paid Service, your use of the Paid Services and any corresponding transactions are subject to…the terms and conditions set forth herein.").

[17] RJN, Ex. 2, ECF No. 38-2 at 4.

in the federal or state courts located in Tarrant County, Texas, United States [e.g., the Northern District of Texas].”[18]

Plaintiff responds that he never saw the Relevant Terms when signing up for Defendants' social media platform X, rendering the forum-selection clauses unenforceable.[19] And even if the forum-selection clauses were enforceable, Plaintiff argues, public interests weigh heavily against their enforcement, and the Court should thus deny the instant motion to transfer.[20]

## DISCUSSION

A forum-selection clause “may be enforced through a motion to transfer under [28 U.S.C.] § 1404(a).” *Atl. Marine Const. Co. v. U.S. Dist. Ct. for W. Dist. of Texas*, 571 U.S. 49, 59 (2013). Section 1404(a) provides, in relevant part, that “[f]or the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district . . . where it might have been brought.” 28 U.S.C. § 1404(a). “[A] proper application of § 1404(a) requires that a forum-selection clause be given controlling weight in all but the most exceptional cases.” *Atl. Marine*, 571 U.S. at 59–60 (citation modified). “[A] resisting party bears a heavy burden in overcoming a presumptively enforceable forum-selection clause.” *Martinez v. Bloomberg LP*, 740 F.3d 211, 219 (2d Cir. 2014) (citation modified).

In the Second Circuit, a forum-selection clause is presumptively enforceable when it was “reasonably communicated to the resisting party, is mandatory, and encompasses the claims and parties at issue.” *Id.* at 227. As relevant here, courts in the Second Circuit have

---

[18] *Id.* at 5.

[19] Resp., ECF No. 45 at 7–11.

[20] *Id.* at 16–18.

repeatedly held that a website's "Terms of Service" or "Terms of Use" are "reasonably communicated" to the website's users when they are presented in a hyperlink that appears on the site's sign-up page. *See, e.g., Meyer v. Uber Techs.*, Inc., 868 F.3d 66, 71, 77–80 (2d Cir. 2017) ("[R]easonable notice" of terms of service was provided, even though plaintiff denied "actual notice," where, "[b]elow the input fields and buttons on the Payment Screen is black text advising users that '[b]y creating an Uber account, you agree to the TERMS OF SERVICE & PRIVACY POLICY.'…The capitalized phrase, which is bright blue and underlined, was a hyperlink that, when clicked, took the user to a third screen containing a button that, in turn, when clicked, would then display the current version of both Uber's Terms of Service and Privacy Policy."); *Zaltz v. JDATE*, 952 F. Supp. 2d 439, 454 (E.D.N.Y. 2013) (dating website's terms of service were reasonably communicated to its users where "the sign-up page contain[ed] a hyperlink to the website's Terms of Service"); *Fteja v. Facebook*, Inc., 841 F. Supp. 2d 829, 837 (S.D.N.Y. 2012) (Facebook terms of service were reasonably communicated to its users where "the user agrees to the Terms of Use not listed on the site itself but available only by clicking a hyperlink" at the sign-up page).

Here, the Court finds that the Relevant Terms and the forum-selection clauses therein were reasonably communicated to Plaintiff. Plaintiff asserts that he signed up for an X account through his Google account, rather than by using his email address.[21] Defendants explain that when users sign up through Google, they must begin at the X homepage. On the homepage, X's Terms of Service are hyperlinked in bright blue directly between (1) buttons for users to "Sign up with Google," "Sign up with Apple," or "Create account" and (2) a prompt asking

---

[21] Resp. at 9–10.

the users if they "Already have an account?" and directing them to "Sign in."[22] The Terms of Service are accompanied by a reminder that "[b]y singing up, you agree to the Terms of Service."[23] Under the case law discussed above, the Court is persuaded that this process satisfies the "reasonably communicated" standard.

The Court is further assured that the Relevant Terms were reasonably communicated to Plaintiff based on the parties' supplemental briefing. Plaintiff, for his part, discloses that he signed up for X around July 2024, via the Google Single Sign-On process.[24] He asserts that he did so because at the time, X "had blocked all public access to content that had previously been available to non-users."[25] Defendants corroborate that "[i]n July 2024, certain content posted on X was available only to X users who were logged in to their account."[26] In their Supplemental Brief, they offer a step-by-step explanation and screenshots of what Plaintiff would have encountered in making his account during that time.[27] The Court is convinced that despite Plaintiff's assertions to the contrary, he had to have encountered the Terms of Service *multiple* times when signing up (e.g. when first blocked from seeing content, when signing in through Google, and when finalizing his sign-up for the service).[28]

Moreover, even if the Court were to accept Plaintiff's argument that signing up through Google somehow prevented him from seeing a forum-selection clause among the Terms of

---

[22] RJN, Ex. 3, ECF No. 39-3 at 2.

[23] *Id.*

[24] Pl. Suppl. at 2.

[25] *Id.*

[26] Def. Suppl. at 2.

[27] *Id.* at 2–7.

[28] *Id.*

Service, that still does not account for why Plaintiff would have been unaware of the second forum-selection clause set forth in the Purchaser Terms of Service at the time he purchased an X Premium subscription. In his supplemental briefing, Plaintiff provides receipts indicating that, at the very least, he subscribed to X Premium+ between April and May 2025.[29] The Court accepts Defendants' representation that these receipts demonstrate that he subscribed to X Premium+ through the X.com website.[30] Nor does Plaintiff assert otherwise.

The Court also accepts Defendants' step-by-step explanation of the process by which a user subscribes to X Premium through the X.com website.[31] Specifically, Defendants state that, in completing the subscription, Plaintiff would have been required to click a "Subscribe & Pay" button, directly beneath which appeared the sentence: "By subscribing, you agree to our Purchaser Terms of Service."[32] The words "Purchaser Terms of Service" were both underlined and bolded and contained a hyperlink directing users to a webpage where the Purchaser Terms could be reviewed in full.[33] Accordingly, the Court finds that, contrary to Plaintiff's assertion that he first encountered the Purchaser Terms of Service only after completing payment, Plaintiff would necessarily have been presented with—and had the opportunity to review—the Purchaser Terms of Service before purchasing an X Premium subscription. And those terms, which were both underlined and bolded *and* contained a hyperlink, were therefore reasonably communicated to him.

---

[29] Pl. Suppl., Exs. A and B, ECF No. 52-2, 52-3.

[30] Def. Suppl. at 8.

[31] *Id.* at 8–9.

[32] *Id.* at 8.

[33] *Id.*

That Defendant X.AI Corp. was not a signatory to the Relevant Terms does not alter the Court's analysis here. Non-signatories may enforce forum-selection clauses where the non-signatory is "closely related" to a signatory such that its enforcement of the clause is "foreseeable." *Magi XXI, Inc. v. Stato della Citta del Vaticano*, 714 F.3d 714, 723 (2d Cir. 2013). Here, the Court finds that X Corp. and X.AI Corp. are indeed "closely related"; Plaintiff essentially treats them as one Defendant throughout his Complaint. And the forum-selection clauses within the Relevant Terms—which invoke "X Entities" including X Corp.'s "related companies"—are broad enough such that X.AI Corp.'s enforcement of the clauses was foreseeable. Thus, X.AI Corp.'s non-signatory status to the Relevant Terms does not alter Defendants' ability to invoke the forum-selection clauses within those terms in seeking to transfer the instant action to the Northern District of Texas. *See In re Optimal U.S. Litig.*, 813 F. Supp. 2d 351, 370 (S.D.N.Y. 2011) (non-signatory could enforce forum-selection clause where his "liability ar[o]se[] out of the same misconduct charged against [the signatory]").

Finally, largely for the reasons discussed by Defendants in their Reply, the Court is unpersuaded that the public interests here outweigh the presumptively enforceable forum-selection clause at issue.[34] Plaintiff identifies no fraud, overreaching, or fundamental unfairness in the chosen forum. *Phillips v. Audio Active Ltd.*, 494 F.3d 378, 392 (2d Cir. 2007). His remaining arguments—grounded in generalized appeals to "child safety" and the inconvenience of litigating pro se—do not implicate any strong Connecticut public policy or demonstrate that trial in Texas would deprive him of his day in court. Under *Atlantic Marine*, such routine considerations cannot overcome the parties' contractual choice of forum.

---

[34] Reply at 9–10.

## CONCLUSION

For the reasons stated above, Defendants' motion to transfer is **GRANTED**. The Clerk is directed to transfer this action to the Northern District of Texas and close this case.

**SO ORDERED.**

Hartford, Connecticut
November 20, 2025

/s/Vernon D. Oliver
VERNON D. OLIVER
United States District Judge